COMMONWEALTH *vs.* ANTHONY VARDINSKI.

No. 99-P-884.

Suffolk. February 12, 2001. - November 30, 2001.

Present: JACOBS, KAPLAN, & DUFFLY, JJ.

Further apellate review granted, 436 Mass. 1101 (2002).

*Robbery. Stealing by Confining or Putting in Fear. Constitutional Law,* Identification. *Due Process of Law,* Identification. *Evidence,* Identification, Veterans' Administration records, Argument by prosecutor. *Practice, Criminal,* Nolle prosequi, Instructions to jury, Argument by prosecutor. *Drug Addiction.*

At a criminal trial, the judge did not err in denying the defendant's motion to suppress the complainant's pretrial identification, where the process through which the complainant selected the defendant's photograph was not so suggestive as to warrant per se exclusion of the identification. [309-310]

At a criminal trial on a charge of armed robbery, the judge impermissibly limited the defendant's efforts to expose the suggestiveness of a pretrial photographic identification of the defendant made by the complainant, when the judge redacted from the mugshot form seen and signed by the complainant information concerning the defendant's prior arrest on a firearms charge, and when the judge prevented the defendant from cross-examining the complainant regarding the firearms information that had been conveyed to him; the issue of whether the confidence expressed by the complainant at trial was the product of suggestiveness was one that properly was for the jury to determine, and in order to make this determination, the jury should have had such evidence before them. [311-315]

This court discussed issues likely to arise at the retrial of indictments charging armed robbery and stealing by confining. [315-317]

INDICTMENTS found and returned in the Superior Court Department on February 3, 1998.

A pretrial motion to suppress evidence was heard by *Suzanne V. DelVecchio,* J., and the cases were tried before her.

*Chauncey B. Wood* for the defendant.

*Rami M. Vanegas,* Assistant District Attorney, for the Commonwealth.

DUFFLY, J. At a jury trial on indictments charging the

defendant with armed robbery, G. L. c. 265, § 17, and stealing by confining, G. L. c. 265, § 21, the primary issue was identification, as there was no physical evidence linking the defendant to the crime. The defendant appeals his conviction of both crimes and the denial of his motion for a new trial.

We find unpersuasive the defendant's claim that the pretrial identification procedure that resulted in the selection of his photograph from an array was so suggestive as to require per se exclusion, and that his motion to suppress was therefore wrongly denied. We agree, however, that he had the right to attack the identification process at trial and that the limitation on the defendant's cross-examination bearing on the issue of suggestiveness constituted prejudicial error requiring reversal. We discuss the defendant's other claims only to the extent that the issues may arise at a new trial.

*Facts.* At or shortly before 7:00 A.M. on January 7, 1998, William Morrissey, the vice-president and chief financial officer of Eastern Baker's Supply (Eastern), arrived at the store's location at 145 North Washington Street in Boston. Consistent with his routine, he opened the front door and walked through the store and offices, turning on the lights and disabling the alarm system. Morrissey then walked towards his own office, where the safe was located. There, a man he had never seen before stuck a long barreled black revolver in Morrissey's face and repeatedly screamed at him to "open the fucking safe." Morrissey had difficulty opening the old-fashioned safe, which had a dial combination. It took him about twenty seconds before he succeeded, during which time the gunman continued to scream into Morrissey's face to give him the money. Morrissey emptied the safe's contents into a canvas duffle bag produced by the perpetrator. They argued about whether Morrissey was able to open several other locked compartments within the safe, Morrissey stating that he could not. The robber then demanded and received from Morrissey both wallets that he was carrying on his person. Morrissey was instructed to lie face down on the floor in front of the safe, and he did so until he heard the man run out of the store. He then got up and immediately dialed 911.

At trial, Morrissey testified that the entire encounter took

from two to three minutes, and that the perpetrator was never more than two feet away from him in the brightly illuminated office. Morrissey also testified to having observed that the robber was wearing a gray cap[1] that was pushed back on his head so that Morrissey could see his hairline and, because the hairline was unusual, Morrissey took note of it and also of a small band-aid on the robber's chin. Two police officers responded to the call, which had been placed at 7:02 A.M. Morrissey's description of the robber to the officers — as an approximately thirty year old white male, about five feet, seven inches tall, weighing approximately 140 pounds and wearing a light gray sweatshirt, sweat-pants, a scally cap and sneakers — made no reference to his hairline.

The defendant erected a defense of mistaken identity shored, albeit weakly, by alibi.[2] The police, searching the defendant's home pursuant to a warrant, found no evidence connecting the defendant to the crime. Over the defendant's objection, two witnesses were allowed to testify that from their vantage point at the Veteran's Administration methadone clinic across from Eastern, they had observed the defendant in the vicinity on days prior to the robbery, and that they had made pretrial identifications of the defendant.

*Discussion.*

1. *Motion to suppress.* The defendant's motion to suppress Morrissey's pretrial identification was denied by endorsement,

---

[1]The transcription of Morrissey's reference to the cap as a "scaly" cap, elsewhere transcribed as a "skull cap," are likely incorrect spellings of "scally" cap.

[2]The defendant's girlfriend, April Locke, testified that on the morning of the robbery, she called the defendant at his mother's house at about 7:00 A.M. (she is not sure precisely when), waking him up. She was pregnant with his child and had called to remind him of that morning's prenatal check-up with the nurse mid-wife at a clinic in Charlestown, and to ask that he meet her there at 7:45 A.M. The nurse mid-wife testified that in February, 1998, Locke had asked her to write a letter to the effect that Locke and her partner had been in her office at 8:15 on the morning of January 7, 1998. She did so having no reason to believe that Locke was lying about the time but, she testified, the time was not accurate. The nurse stated she scheduled no appointments prior to 8:30 A.M., and never saw patients earlier than that.

unaccompanied by written findings.[3] During the suppression hearing the motion judge made statements, in effect oral findings, that the array from which Morrissey had made his selection consisted of a sufficient number of photographs fitting the generic description of the defendant; "[t]here was no indication in this case that there was any coaching ahead of time to select that particular photograph;" and "Morrissey was emphatic that [the] photograph" he selected was of the person who had robbed him. The judge's findings were not challenged by the defendant, and we conclude that the judge did not err in denying the motion to suppress.

Although the process through which Morrissey selected the defendant's photograph was not so suggestive as to warrant per se exclusion of the identification, *Commonwealth* v. *Johnson,* 420 Mass. 458, 462 (1995), it remained available to the defendant to attack Morrissey's identifications at trial on the ground that information conveyed to Morrissey when he signed the mug shot form — specifically information that the defendant had previously been arrested on a firearms charge — had the effect of confirming or bolstering his selection. Where the "procedures . . . used to elicit the identifications 'may have in some respects fallen short of the ideal,' " the identifications need not be suppressed. *Commonwealth* v. *Correia,* 381 Mass. 65, 79 (1980) quoting from *Simmons* v. *United States,* 390 U.S. at 385-386 (1968). See *Commonwealth* v. *Mobley,* 369 Mass. 892, 896-897 (1976) (no error in denial of motion to suppress; although showing witness pictures of defendant participating in unrelated armed robbery "was undoubtedly prejudicial in some circumstances," it was not prejudicial where it occurred "after the witness had made an unequivocal identification of the defendant from a selection of six pictures of reasonably similar men"). The issue of identification is, however, a proper subject of cross-examination. *Commonwealth* v. *Correia, supra* at 79. See *Commonwealth* v. *Jones,* 375 Mass. 349, 355 (1978); *Commonwealth* v. *Dougan,* 377 Mass. 303, 316 (1979). We proceed to a discussion of the defendant's claim in this regard.

---

[3]As we have previously observed, "[i]t would have been helpful if the parties had requested the motion judge to enlarge upon her [oral] findings." *Commonwealth* v. *Day,* 42 Mass. App. Ct. 242, 248 n.2 (1997).

2. *Trial judge's evidentiary rulings.* We summarize briefly the evidence at trial regarding the pretrial photographic procedure. Two days following the robbery, at the request of Detective James Moy, Morrissey went to the police station to look at photographs of possible suspects. Morrissey described the person who had robbed him as a slightly built white male, approximately five feet, seven inches tall, and weighing approximately 130 to 140 pounds, but again gave no particularized details, such as the unusual hairline he testified at trial to having observed. Detective Moy set up a photo array using a computerized photo imaging machine — essentially an electronic mug book — by entering the general criteria provided by Morrissey as to the perpetrator's race, height and weight. A computerized data bank search generated the photographic images of 999 males meeting these criteria, meaning that there were likely more males that met these criteria but only the maximum number of 999 would be transmitted for viewing. Morrissey was instructed that he would be viewing one image at a time, and that by clicking on a computer "mouse" button he could advance to the next image after viewing each image for as long as he wished. At a certain point in the process Morrissey selected a photograph, number 82, of "the man that robbed me." The photograph was of the defendant. Detective Moy printed a copy of the photograph selected by Morrissey. This printout contained the inscription "Boston Police Department Mugshot Form" and included a front and profile view of the defendant. The printout also set forth the defendant's name and other identifying information, and listed a booking number, an October, 1997, booking date, and the information that Anthony Vardinski had been arrested for illegal possession of a firearm on that date. Morrissey signed the printout after viewing it, placing his signature on the front of the form next to this printed information.

Massachusetts courts have delineated those pretrial identification procedures that avoid suggestibility in the identification process. The approved procedures include the following characteristics: the array consists of several photographs of individuals having the same general characteristics described by the witness, *Commonwealth* v. *Jones*, 375 Mass. 349, 354 (1978);

the defendant's photograph included in the array does not stand out, *Commonwealth* v. *Chase*, 372 Mass. 736, 740 (1977); police officers conducting the identification procedure do not possess information about the defendant and make "no gestures or comments concerning any set of photographs," *ibid.*; information about the defendant's prior arrest is not disclosed to the victim at any time, *Commonwealth* v. *Gordon*, 6 Mass. App. Ct. 230, 234 (1978); a witness is "not told where the photographs [come] from or who the individuals shown in them [are]," *Commonwealth* v. *Avery*, 12 Mass. App. Ct. 97, 100 (1981). See *United States* v. *Wade*, 388 U.S. 218, 236 n.26 (1967); *Simmons* v. *United States*, 390 U.S. 377, 383 (1968); *Commonwealth* v. *Botelho*, 369 Mass. 860, 866 (1976); *Commonwealth* v. *Johnson*, 420 Mass. 458, 462-463 (1995); Model Code of Pre-Arraignment Procedure § 160.2, Commentary at 434-448 (Proposed Official Draft 1975).[4]

The defendant claims that the trial judge impermissibly limited his efforts to expose the suggestiveness of the photographic identification when she denied his request that the mug-

---

[4]We note that these procedures are consistent with recently developed guidelines for use by law enforcement. Eyewitness Evidence, a Guide for Law Enforcement, U.S. Dept. of Justice, National Institute of Justice, Oct. 1999. The guidelines suggest among other things that "mug books" be composed in a non-suggestive manner with photographs to be grouped by format (e.g. color or black and white) so that no photograph stands out, and by general physical characteristics of the individuals selected. A photograph of the suspect should be selected that, inter alia, is reasonably contemporary and only one photograph of a suspect should be included. Sec. II(A). Investigators should "[d]escribe the mugbook to the witness only as a 'collection of photographs.' " Sec. II(C)(2).

In connection with a photo line-up:

> "The investigator should . . . [e]nsure that no writings or information concerning previous arrest(s) will be visible to the witness . . . [and that] the suspect does not unduly stand out." Sec. V(A)(9), (10).

> "When presenting a sequential photo lineup, the investigator should . . . [a]void saying anything to the witness that may influence the witness' selection." Sec. V(C)(3)

> "If an identification is made, avoid reporting to the witness any information regarding the individual he/she has selected prior to obtaining the witness' statement of certainty." Sec. V(C)(4).

shot form signed by Morrissey and admitted in evidence at the Commonwealth's request be presented to the jury in the manner it had appeared to Morrissey.[5] The copy of the photograph received in evidence to be viewed by the jury contained the printed information providing a booking number; the October, 1997, booking date; an incident number; a booking name; and a verification of booking status. The copy thus clearly indicated that the defendant had been arrested prior to the robbery, although not the reason for the arrest.

The defendant argues that in order to convey the suggestive nature of the identification — suggestive because it could have had the effect of bolstering or confirming Morrissey's identification, thus inducing in Morrissey a level of confidence about his selection that would not have been there but for the confirming information about the firearms charge — it was necessary that the jury learn that the reference to the firearms charge was on the printout when signed by Morrissey. The defendant then would have been able to pursue his claim that, since the robber had pointed a gun in Morrissey's face, any uncertainty Morrissey may have harbored about his identification would have been eradicated by his learning that the person he identified had been arrested on a firearms charge.

The defendant objected when the judge redacted the information concerning the defendant's prior arrest on a firearms charge from the mugshot form. He also objected when, during cross-examination of Morrissey, he was prevented from inquiring about the firearms information that had been conveyed to the witness. We consider whether these evidentiary rulings were error and, if so, whether "we are sure that the error 'did not influence the jury, or had but very slight effect . . . .' " *Commonwealth* v. *Federico*, 425 Mass. 844, 852 (1997), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

In *Commonwealth* v. *Bonnoyer*, 25 Mass. App. Ct. 445, 448-449 (1988), we upheld the suppression of a pretrial identification where, when the witness expressed doubts about her selec-

---

[5]The defendant did not object when the prosecutor introduced the printout with none of the written inscriptions redacted. Later during the trial, at the prosecutor's request and over the defendant's objection, the judge sua sponte redacted the reference to the firearms charge.

tion of the defendant's photograph, the police investigator told her not to worry because a suspect had confessed and named the defendant as his accomplice. We noted in *Bonnoyer* that the trial judge's reasons for suppressing the identification were that the witness "could not be cross-examined effectively about her doubts concerning the accuracy of the photographic identification because those doubts no longer existed, and she could not be effectively cross-examined as to the earlier doubts without bringing out the otherwise inadmissible and (to [the defendant]) ruinous evidence that [another suspect] had identified [the defendant] as his accomplice. To the jury it could appear that [the witness's] photographic identification, thus insulated from fully effective challenge, was reliable independent evidence of Bonnoyer's complicity, where in truth it had been fraught with doubt and uncertainty." *Ibid.*

Here, we have upheld the denial of the motion to suppress in large degree based on the judge's finding that there was no prior coaching of the witness, but the language in *Bonnoyer* is nevertheless instructive on the issue that properly was for the jury to determine: whether the confidence expressed by Morrissey at trial was the product of suggestiveness. In order to make this determination, the jury should have had before them the evidence that Morrissey had been informed of the firearms charge. See *Commonwealth* v. *Payton*, 35 Mass. App. Ct. 586, 591-592 (1993) (unsanitized mugshots properly admitted where it was "clear from the record that part of the trial counsel's strategy was to attack the photographic identifications by showing that the array was so suggestive as to lead the identifying witness[] to make faulty identifications"). Cf. *Commonwealth* v. *Sheehan*, 435 Mass. 183, 190 (2001) ("To the extent that the records were damaging to the defense . . . , it was for defense counsel to decide whether their value outweighed their harm"). Contrast *Commonwealth* v. *Day*, 42 Mass. App. Ct. 242, 246 (1997) (where we held that it was "manifestly unreasonable" for counsel to seek introduction of unsanitized "wanted" flyer of defendant observed by witnesses waiting in police station prior to photographic array, because flyer identified defendant as responsible for shooting they had witnessed and indicated he was armed and dangerous).

"Even considering the broad discretion permitted the judge in controlling the scope of cross-examination, we see no good reason here for the judge's limitation of examination related to circumstances surrounding the . . . confrontation." *Commonwealth* v. *Dickerson*, 372 Mass. 783, 788 (1977). There was a paucity of corroborating evidence connecting the defendant to the crime. With identification the key factor, the strongest available defense was an attack on the identification process. In these circumstances, we cannot conclude that the errors noted did not materially prejudice the defendant. Reversal is required.

3. *Issues likely to arise at trial.* We address those issues raised by the defendant that are likely to arise again during any retrial.

The defendant sought to present evidence that a nolle prosequi had been filed in connection with the firearms charge. The police should have removed from the printout presented to Morrissey for signing all of the information revealing that the suspect had previously been arrested. It was this failure to do so, coupled with the Commonwealth's introduction in evidence of the photographic identification and Morrissey's subsequent identification of the defendant at a physical lineup, that compelled the defendant to seek first to attack the suggestibility of the identification process and then to counteract the prejudice inherent in the admission of the mugshots. He sought to dispel this prejudice by presenting evidence that the charge that resulted in his photograph being taken had been nolle prossed. In these circumstances (with the added circumstance of the information regarding the firearms charge going to the jury), we would incline to a ruling that the denial to admit in evidence the bare fact of the nolle prosequi constituted an abuse of discretion because admission of this information was a reasonable means "to counteract the prejudice to the defendant," *Commonwealth* v. *Bonnoyer, supra* at 450, that was created by police. Whether discretion is abused or properly exercised will depend on the nature of the evidence at the subsequent trial and any limiting, contemporaneous instruction.[6]

The motion to suppress pretrial identifications of the

[6]An appropriate instruction might include one that forcefully reminds the jury that the sole purpose for which they may consider the prior firearms

defendant by Richard Leeman, a lieutenant with the Veteran's Administration police, and Jorge Lebron Colon, a patient at the Veteran's Administration Methadone clinic located across the street from Eastern, was properly denied. A photograph of the defendant was shown to Leeman and Colon as part of the preliminary police investigation in the immediate aftermath of the crime. Neither was a percipient witness to the crime.[7] See *Commonwealth* v. *Barnett*, 371 Mass. 87, 92 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Shipps*, 399 Mass. 820, 831 (1987); *Commonwealth* v. *Johnson*, 420 Mass. at 461.

The defendant's claim that the judge should have charged on "good faith error" is governed in all respects by our decision in *Commonwealth* v. *Traylor*, 43 Mass. App. Ct. 239, 247 (1997). There, as here, "the defendant did not request the instruction. Instead, he asked only for the 'standard instruction' on identification, which was given. We know of no rule that requires the judge to give a [*Commonwealth* v.] *Pressley*[, 390 Mass. 617 (1983),] instruction sua sponte, in the absence of a proper request." *Ibid.*

The defendant claims that the prosecutor's closing comment, that Morrissey's level of certainty "was so high" because "you remember people who have an impact on your life," was improper because there was nothing in the evidence to support the insinuated correlation between the impact of an event and the accuracy of its recollection. The prosecutor's argument was proper to the extent that it directed the jury's attention to Morrissey's testimony as to his level of certainty. *Commonwealth* v. *Drane*, 47 Mass. App. Ct. 913, 914 (1999).

The trial judge properly denied the defendant's motion for

charge — a charge that may well have resulted in dismissal or acquittal — is to determine any suggestive effect of this information on the witness's subsequent identifications; even if it had resulted in conviction, this fact could not be considered in determining the defendant's guilt.

[7] In its opening, the Commonwealth argued that Lieutenant Leeman and Colon would provide "opportunity evidence," and that Colon saw the defendant "in the early morning hours in the days leading up to the crime." We leave to the trial judge's discretion whether, in view of the fact that testimony from these witnesses was equivocal as to the dates and times they observed the defendant in the vicinity of the clinic, this marginally relevant testimony is on balance so prejudicial as to outweigh its admission.

production of Colon's Veteran's Administration treatment records, filed on the first day of trial, as untimely. There were numerous opportunities for the defendant to press for production of these privileged documents during pretrial discovery. The judge did not abuse her discretion in refusing to delay the proceedings, likely for a significant period of time, to consider the defendant's late request. See *Commonwealth* v. *Stephens*, 44 Mass. App. Ct. 940, 944 (1998) (no error in refusing to consider motion for production of privileged treatment records made at opening of defendant's trial).[8]

As for the other contested comments in the prosecutor's closing, we observe only that both parties are required to hew closely to the trial testimony in summarizing the evidence. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 416 (1978) ("[i]n closing argument, counsel may argue the evidence and the fair inferences from the evidence"). By arguing facts or inferences not supported by the evidence, a prosecutor risks reversal.

Finally, as to the admission of testimony elicited by the prosecution regarding Colon's drug treatment, we see no error. The defendant himself first raised the issue of methadone treatment during cross-examination of Morrissey. See *Commonwealth* v. *O'Brien*, 35 Mass. App. Ct. 827, 834 (1994) (no error in prosecutor pursuing potentially inadmissible matters where defense opened door on cross-examination). Furthermore, we perceive no risk that the jury would have inferred that because Colon was a recovering drug addict, the defendant likewise had abused drugs. At any retrial, subject to the discretion of the trial judge, these matters may be probed by the Commonwealth.

*Judgments reversed.*

*Order denying motion*
*for new trial reversed.*

---

[8]We note also that the defendant has failed to make any showing, either at trial or on appeal, as to how these documents might have been relevant.